*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

*In re* D. P. ROZENBOOM, Minor.

FOR PUBLICATION
February 11, 2025
3:01 PM

No. 371439
Wayne Circuit Court
Family Division
LC No. 2023-01938-NA

Before: BOONSTRA, P.J., and M. J. KELLY and MALDONADO, JJ.

MALDONADO, J.

Petitioner appeals as of right the trial court's order affirming a referee's recommendation to dismiss a petition to terminate respondent's parental rights to her minor child, DPR, pursuant to MCL 712A.19b(3)(f) (abandonment). We affirm.

## I. BACKGROUND

Respondent is the mother of four children: DPR, JR, NR, and AR. Petitioner is the second cousin of DPR's father, who died during the pendency of the proceeding. DPR was born in October 2014 and began living with petitioner the following March. Respondent lived with petitioner and DPR from November 2015 until March 2016, but DPR continued to live with petitioner after respondent left. Petitioner obtained a power of attorney over DPR in 2019, and she obtained a permanent guardianship in August 2020. The probate court ordered supervised parenting time in January 2021, but over the following months respondent frequently missed, canceled, or was late for her parenting time. Respondent's last supervised parenting time with DPR occurred in May 2021, and petitioner indicated that respondent yelled at DPR for referring to her by her first name, stated that she would not be continuing her Wednesday visitation, and stormed out of the visit. Respondent ceased exercising her parenting time and never moved the probate court to enforce the visitation order. As discussed later, the record of communication between petitioner and respondent from this point forward has been remarkably well preserved through text messages sent on Facebook Messenger.

On January 20, 2023, respondent gave birth to AR. In June 2023, petitioner sought authority from the probate court to seek adoption of DPR. In July, respondent moved for

unsupervised visitation, but was denied. In August, a motion to terminate the guardianship was denied. Then, the probate court granted petitioner's request to seek adoption. A 4-day bench trial on the adoption petition commenced and then concluded on April 29, 2024. Petitioner testified that respondent did not send any cards, letters, or other correspondence to DPR during the two years preceding the filing of the petition. Although respondent had petitioner's phone number, respondent never called petitioner to speak with DPR, and petitioner did not have a phone number for respondent after 2021. Respondent was never ordered to pay child support for DPR, nor did respondent provide any financial support for DPR in the two years preceding the filing of the petition. Petitioner provided all of DPR's food, clothing, school supplies, health insurance, and other needs. Petitioner opined that termination of respondent's parental rights was in DPR's best interests because petitioner was the only mother DPR knew, DPR had a sense of security with her, and DPR was happy in her care.

Respondent also testified at the trial. She testified that she was addicted to crack cocaine and alcohol between 2015 and 2022 but was sober at the time of her testimony. DPR began residing with petitioner in 2015 because respondent was "in a bad part of [her] life." Respondent exercised parenting time with DPR under petitioner's supervision from January 2021 until May 2021. Respondent testified that the supervised parenting time ended after a May 2021 session during which DPR asked respondent if he could stay overnight at her home; respondent stated that they could plan something with petitioner, which caused DPR to cry. After petitioner and DPR left the visit, petitioner told respondent that the visits would not continue because they gave DPR too much anxiety and depression. Respondent acknowledged that there were periods of time in 2022 and 2023 when she did not reach out to petitioner to facilitate parenting time. Respondent testified that she did not reach out to petitioner because she felt discouraged by petitioner stating that she was DPR's mother, not respondent, and by petitioner repeatedly rejecting respondent's attempts to contact DPR. Respondent did not file a motion to enforce her visitation in the probate court because she did not have a lawyer, nor the money to afford a lawyer. Further, respondent believed that petitioner had the authority to stop the supervised visits.

On April 29, 2024, the referee recommended denial of the adoption petition. The referee found that petitioner proved by clear and convincing evidence that respondent had the ability to financially support DPR but failed or neglected without good cause to provide support for the two years preceding the filing of the petition. The referee also found that respondent did not have substantial contact with DPR for the two years preceding the filing of the petition. However, the referee found that petitioner failed to prove by clear and convincing evidence that respondent had the ability to visit, contact, or communicate with DPR during this time period. In support of this finding, the referee discussed the Facebook messages between the parties, in which "it is clear that [respondent] did not, in fact, have the ability to visit" DPR due to petitioner's unwillingness to facilitate this contact. The referee spent a large portion of his findings reading messages in which respondent asked for contact with DPR and petitioner refused. The referee also criticized petitioner for giving "the now nine year old minor child veto power over whether visits would or would not take place." Accordingly, the referee recommended against the termination of parental rights because petitioner failed to present clear and convincing evidence to support termination of respondent's parental rights pursuant to MCL 712A.19b(3)(f). The trial court thereafter entered an order adopting the referee's findings and dismissing the petition. Petitioner then sought review of the referee's recommendation, but on June 5, 2024, the trial court entered an order finding that

it would not have reached a different conclusion than the referee and that the referee did not clearly err.

This appeal followed.

## II. DISCUSSION

Petitioner argues that trial court clearly erred by finding that she failed to present clear and convincing evidence to support the statutory ground for termination alleged in the petition. We disagree.

"In order to terminate parental rights, the trial court must find by clear and convincing evidence that at least one of the statutory grounds for termination in MCL 712A.19b(3) has been met." *In re Jackisch/Stamm-Jackisch*, 340 Mich App 326, 333; 985 NW2d 912 (2022) (quotation marks and citation omitted). This Court reviews for clear error a trial court's findings as to whether statutory grounds exist to terminate parental rights. *Id.* "A trial court's decision is clearly erroneous if although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been made." *In re Olive/Metts Minors*, 297 Mich App 35, 41; 823 NW2d 144 (2012) (quotation marks, citation, and alteration omitted).

A trial court may terminate parental rights pursuant to MCL 712A.19b(3)(f) when:

(f) The child has a guardian under the estates and protected individuals code [(EPIC), MCL 700.1101 *et seq*.], and *both* of the following have occurred:

(*i*) The parent, having the ability to support or assist in supporting the minor, has failed or neglected, without good cause, to provide regular and substantial support for the minor for a period of 2 years or more before the filing of the petition . . . .

(*ii*) The parent, having the ability to visit, contact, or communicate with the minor, has regularly and substantially failed or neglected, without good cause, to do so for a period of 2 years or more before the filing of the petition. [MCL 712A.19b(3)(f)(*i*)-(*ii*) (emphasis added).]

In this case, the trial court found clear and convincing evidence that respondent had the ability to provide financial support for DPR but failed, without good cause, to provide regular and substantial support for the two years preceding the filing of the petition. The trial court also found clear and convincing evidence that respondent did not have substantial contact with DPR during the two years before the filing of the petition. However, the court then found that the evidence demonstrated that respondent did not have the ability to visit, contact, or communicate with DPR because respondent requested contact with DPR on numerous occasions, but petitioner denied respondent's requests. The trial court, therefore, concluded that petitioner failed to present clear and convincing evidence to support termination of respondent's parental rights under MCL 712A.19b(3)(f) and dismissed the petition.

The text messages exchanged between petitioner and respondent overwhelmingly support the trial court's finding that petitioner blocked respondent from visiting, contacting, and

communicating with DPR. These messages establish a pattern in which petitioner—who decided very early that she was DPR's actual mother—was openly hostile toward respondent, refused to facilitate reunification, and made DPR the arbiter of respondent's parenting time before his seventh birthday.

A common theme of this saga was petitioner's decision to put DPR in the middle from a very young age by making him decide whether and to what extent he would have contact with respondent. Another common theme was petitioner's insistence that she was DPR's mother and that she, therefore, had the right to decide if, when, and under what circumstances respondent could see her son. The following exchange occurred on October 3, 2021, before DPR's seventh birthday:

> *Respondent.* Can I talk to [DPR] . . . ? I really miss him alot. [sic] I start my new job Monday and im [sic] doing pretty good. I would really appreciate it.

> *Petitioner.* I asked [DPR] if he wanted to speak to you and he said no.

> *Respondent.* Well can you at least tell him I love him.

> *Petitioner.* I told him and and [sic] his response was that he hopes you leave his brothers alone. [JR] and [NR] told [DPR] about of [sic] bad things you did and allowed to happen. Actions mean more than words and you[r] actions definitely don[']t say love.

On May 5, 2022, respondent reached out "to say thank you for everything." Respondent thanked petitioner for being DPR's "caregiver," expressed hope that she could have a relationship with DPR, asked for pictures of DPR, and expressed a desire to hear from petitioner. Petitioner responded:

> You are welcome. *I am not his caregiver, I am his Mom*, he knows no different. We appreciate that you gave birth to him and will always be grateful for that. We are doing great. I hope you find it in you to stay sober and get your mental health together, that is best for everyone in the long run. Everyone is exhausted from the mental rollercoaster ride that you had everyone on. The lies and hurt are very deep. I am supporting from a distance, I want you to succeed with life. Best of luck. [Emphasis added.]

Respondent then asked for a picture of DPR, but petitioner declined.

Another example of petitioner denying respondent access to DPR occurred on August 13, 2022:

> *Respondent.* Hey [petitioner] is there any way I may be able to call [DPR] on the phone and say hi?

> *Petitioner.* Not at this time.

> I asked him he said no.

-4-

Please refer to my previous messages.

The following exchange in which DPR was put in the middle occurred on October 24, 2022—DPR's eighth birthday:

*Respondent*. Hey can you show this to [DPR]. ["]Happy birthday buddy I hope you had a great day. I love and miss you.["] Could you send me a few pictures of him

*Petitioner*. He read it and said thank you.

*Respondent*. So you can't send me a picture of him. I don't understand why I can't have a recent picture of him.

*Petitioner*. Wow, I am discussing it with him because he didn't want to. We are currently hiking in the woods. Wow

He told me now not to send one.

*Respondent*. Okay I only asked cause I've asked before many times and haven't got to see one. . . . I can't see anything on your Facebook so I really don't get to see pictures of him. Kinda hurts.

*Petitioner*. You have never asked.

*Respondent*. Tell him I love him and I'm sorry.

Yes I have

Petitioner ultimately sent a picture because "DPR said I could send" one but on the condition that respondent not post it on social media because "I read him all of your post[s] about him and he doesn't like it."

Petitioner reached out on January 20, 2023, when respondent went into labor with AR to wish her "a safe, painless labor and a healthy baby!!!" The following day, respondent sent petitioner pictures of the new baby. Three days after that, petitioner reached out to tell respondent that she and DPR "bought some stuff for" the new baby and that it would be arriving soon. Respondent suggested that DPR could meet AR soon, and petitioner responded, "That is definitely a possibility in the future." On February 2, 2023, respondent asked about seeing DPR and petitioner said, "maybe in the next week or two." This never came to fruition. On March 17, petitioner agreed to let respondent see DPR upon returning from a trip to Florida, but this also did not come to fruition. Respondent sent the following message on May 15, 2023: "[NR and JR] are coming up for the summer maybe we can all get together when they are here." Petitioner did not reply. On May 27, 2023, respondent reached out again:

*Respondent*. Hey [petitioner] the boys will be here tomorrow night until the end of June and [JR] wanted to spend a week with [DPR] but I told him that he can

-5-

do 3 days[,] 1 week[,] and 3 days to another week because we're going up north the last week if you could just get back with me let me know we're going to be at my sister's maybe I could see [DPR]

> *Petitioner.* I was going to make my arrangements with Mike and have [JR and NR] stay with me at the end of the trip. You blew off [DPR] since January. He isn't interested in seeing you he said after I read him the last message you sent. It's crazy how you can still hurt his feelings.

Petitioner and respondent then argued over whether petitioner had been effectively communicating with respondent. Respondent expressed that she had "been working really hard" to be mentally capable for DPR and that she felt as though she "got shot down every time" she reached out about seeing DPR. Petitioner responded, "I will talk to him but I will not allow *my son* [to] get hurt." (Emphasis added.)

Petitioner's most egregious overstep was her decision that respondent could not exercise parenting time unless she submitted to a drug screen. The following was said during the same exchange on May 27, 2023, when DPR was still only eight years old.

> *Petitioner.* I would also like you to take a full drug and alcohol test to make sure you are sober. I hope that is ok, but I don't want to take any chances.
>
> *Respondent.* Well if . . . you would like to buy the test I will happily take it for you
>
> *Petitioner.* I will pay for a professional one if [DPR] decides to see you.
>
> *Respondent.* That's perfectly fine I'm willing to do whatever it takes to be able to see him
>
> *Petitioner.* I just talked to him and he said Please [t]ell Heather I don't want to see her.
>
> I spoke to Beaumont labs and they can do a blood draw drug test and get the results back in a few days. If [DPR] changes his mind I will get a hold [sic] of you and set up an appointment. Have a great day.

What ensued was a pattern of respondent attempting to set up the drug test and petitioner kicking the can. Petitioner reached out on May 28 to "set up the drug test and get it out of the way," and the following exchange occurred on May 30.

> *Respondent.* Sorry I've been busy with the boys. Can we set it up for this weekend? I work all week till 7.
>
> *Petitioner.* The clinic told me Monday through Friday, but I can try other clinics. I do not want to spend extra money for weekend hours. If you can't make it work during the week, then maybe you can help pay for the additional cost. Our

weekends are booked until the end of June, so if you need to do it on the weekend, it would have to wait until then. . . .

*Respondent.* I can take Monday next week off if that's fine with you, I just started working so it's hard to take days off I have to work to live. . . . I'll pay whatever you can't pay. I really wanna see him it's [sic] been 2 years [petitioner]. I've been working very hard to get to where I'm at.

*Petitioner.* . . . [DPR] *is my son*, and I do everything to protect him. . . . [DPR] is in school. We will make sure to figure something out for [DPR, JR, and NR] to see each other. I can tell you that [DPR] will not be seeing you and the boys together this visit. Maybe in their next visit, we will have time to get things organized.

We can wait until next month for the test that way you don't risk your job.

*Respondent.* . . . [Y]ou pick the day next month and let me know what's good for you and I'll make it. I will work around your schedule. . . . [Emphasis added.]

Respondent reached out again the following month, on June 22, and Petitioner again kicked the can:

*Respondent.* Hey is there anyway you can have the boys call me please

I know it's late but maybe tomorrow

Tell them I love them and miss them please

*Petitioner.* I will have [JR] and [NR] call tomorrow

*Respondent.* Thank you I appreciate it.

And do you know what day you'll have free to do the drug test.

*Petitioner.* No.

Maybe next month

*Respondent.* Well let me know when I can do any day.

*Petitioner.* Ok, [DPR] isn't interested in seeing you, so I am not in a huge rush, but I will let you know. Goodnight.

The following exchange occurred on August 30, 2023, after petitioner began the process of seeking adoption of DPR and termination of respondent's parental rights:

*Respondent*. Hey [petitioner]. I know this has been hard on both of us. Whatever happens in court happens in court. I understand why your [sic] doing this. And I thank you for caring for him. But I'm in a place where I believe I can care for my son. It's really hard on all the boys and [I] would like to set up some kind of communication for the boys to be able to continue their relationship.

*Petitioner*. My lawyer requested not to speak to you at the time.

*Respondent*. This isn't about you and I it's about the children.

Please tell my son I love him.

*Petitioner*. I told him but he didn't want [to] say anything back. . . .

Respondent then reached out on DPR's tenth birthday. Respondent asked petitioner what DPR wanted for his birthday but did not get. Petitioner responded, "If you seriously want to know, when he blew out his candles, he told everyone that his birthday wish is to be adopted."

At the outset of our analysis, we note the heightened standard of proof as well as the deferential standard of review. Petitioner was required to prove the ground for termination by clear and convincing evidence. *Jackisch/Stamm-Jackisch*, 340 Mich App at 333. Clear and convincing evidence "is the most demanding standard applied in civil cases" and requires "evidence so clear, direct[,] and weighty" that the fact finder can "come to a clear conviction, without hesitancy, of the truth of the precise facts in issue." *In re ASF*, 311 Mich App 420, 429; 876 NW2d 253 (2015) (quotation marks and citations omitted). Therefore, petitioner had a very high bar to clear in the trial court. Further, petitioner must overcome the clear error standard of review on appeal. This means that prevailing on appeal requires petitioner to show that the court made a clear error when it found that petitioner did not meet the highest burden of proof applicable in civil cases. Petitioner cannot clear the high bar set by the strict standard of proof in conjunction with the deferential standard of review.

The record supports a finding that respondent spent years persistently attempting to contact and visit DPR. The record further establishes that petitioner persistently rebuffed these efforts in direct violation of the probate court's January 2021 order directing that respondent would have two hours of supervised parenting time every Wednesday. Many of respondent's attempts to see or speak with DPR were met with hostility or shame. There were two instances early in 2023 when petitioner agreed to the idea of respondent seeing DPR in the near future, and both times neither party ever took initiative to set up a firm date and time. While respondent certainly should have taken an active role in driving this visitation, the court did not clearly err by finding that her failure to do so did not constitute clear and convincing evidence of a regular and substantial failure to visit and communicate with DPR. At this point, petitioner again violated the court order by demanding that respondent take a drug test prior to allowing respondent to have access to DPR. However, she then continued to push the test back for months at a time in spite of respondent's efforts to schedule and complete the testing. Further, petitioner's rejections of respondent's attempts at contact were usually premised on DPR's reported desire not to see or speak with respondent. Had this been a traditional custody dispute, no reasonable court would charge such a young child with crafting and enforcing parenting time arrangements. Moreover, given

petitioner's open hostility toward respondent as well as her declarations that she was DPR's mother, it would be reasonable to infer that petitioner was influencing DPR's opposition.

"It is well-established that parents have a fundamental right to the care, custody, and control of their children." *In re C Walters Minor*, ___ Mich App ___, ___; ___ NW3d ___ (2025) (Docket No. 369318); slip op at 1. Despite petitioner's repeated declarations to the contrary, respondent is DPR's mother. Therefore, respondent has a fundamental right to the care, custody, and control of DPR. In recognition of parents' fundamental rights, Michigan policy "elevates reunification of parents and children over termination of parental rights." *Id*. However, the record is clear that petitioner decided early in these proceedings that she was never going to return DPR to respondent. This is evidenced by the fact that petitioner repeatedly referred to herself as DPR's mother—as early as May 2022—and allowed DPR to refer to respondent by her first name. Notably, were this a traditional termination case in which proceedings were initiated by the state, the court would have been compelled to deny termination on the basis of the failure to make reasonable efforts toward reunification. See *id*. at ___; slip op at 3. The record suggests that petitioner made no effort to foster a relationship between respondent and DPR or to otherwise facilitate reunification. Even after dictating that respondent undergo drug testing before petitioner would even consider allowing visitation, petitioner put the testing off for months and requested that respondent pay any additional fees if it needed to take place on a weekend. Ruling in favor of petitioner in this matter would require us to implicitly hold that parents who place their children in guardianships have fewer rights than those who have their children removed by the state; we decline petitioner's invitation to make such a ruling.

Petitioner's primary argument on appeal is that respondent never sought court enforcement of the January 2021 parenting time order. Petitioner is correct that respondent was entitled to weekly parenting time but did not seek judicial intervention until petitioner initiated adoption proceedings during the summer of 2023. Had the court determined on this basis that petitioner was entitled to adopt DPR, we would defer to this finding. However, the fact that respondent had neither a lawyer nor any sort of legal education supports a finding that she did not understand her rights. The record, including respondent's testimony, suggests that respondent believed petitioner had the right to dictate respondent's visitation, and the messages laid out earlier demonstrate a lopsided power dynamic in which respondent believed she needed to answer to petitioner. In this regard, we echo the concerns expressed by Justice Cavanagh in *In re Guardianship of Orta*, 508 Mich 913 (2021) (CAVANAGH, J., concurring). In that case, Justice Cavanagh described a mother's repeated unsuccessful efforts to terminate a guardianship without an attorney's assistance and explained how the mother "was seemingly unaware that she had a winning issue on appeal." *Id*. The mother did not succeed with terminating the guardianship until she retained an attorney who did file an appeal. *Id*. Justice Cavanagh found the case "troubling" because "the failure to adhere to a court-structured guardianship plan can segue into a termination of parental rights at which point the lack of attorney assistance at the guardianship stage may be impossible to untangle." *Id*. (citation omitted). We likewise find this case "troubling" and therefore decline to disturb the trial court's decision to prevent this guardianship from segueing into termination on the basis of petitioner's conduct.

In conclusion, we discern no clear error arising from the trial court's decision not to terminate respondent's parental rights to DPR.

Affirmed. Respondent, being the prevailing party, may tax costs. MCR 7.219(A).

/s/ Allie Greenleaf Maldonado
/s/ Mark T. Boonstra
/s/ Michael J. Kelly